# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**OMAR J. SMITH,**

      **Petitioner,**

      **v.**                                  **Case No. 15-CV-603**

**WILLIAM J. POLLARD,**

      **Respondent.**

---

## DECISION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

---

Omar J. Smith, a prisoner in Wisconsin custody, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Smith was convicted of one count of first degree reckless homicide, as party to a crime; two counts of recklessly endangering safety, as party to a crime; one count of felon in possession of a firearm; and one count of felony bail jumping. (Habeas Petition at 2, Docket # 1.) Smith was sentenced to sixty-two years of initial confinement followed by thirty-eight years of extended supervision. (*Id.*) Smith alleges that his conviction and sentence are unconstitutional. For the reasons stated below, the petition for writ of habeas corpus will be denied and the case dismissed.

## BACKGROUND

Smith's conviction and sentence stem from an incident that occurred on April 17, 2009. (Answer, Exh. 5, *State v. Smith*, 2012AP863 (Wis. Ct. App. Sept. 10, 2013), Docket # 12-5.) At approximately 8:30 p.m. that night, several friends gathered outside a home at 2465 West McKinley in Milwaukee. (*Id.* at 2.) The friends saw three men in black hoodies

across the street start shooting at them. (*Id.*) Bullets from the guns hit three women in the group and one of the women died from the nine-millimeter bullet that hit her heart. (*Id.*)

A few days later, police detectives questioned Smith about the shooting. (*Id.*) The police stopped the interview when Smith asked for a lawyer and the officers packed up and left the room. (*Id.*) When a detective came back to give Smith the cigarette he requested, Smith reinitiated the interview saying, "he wanted to tell [the detectives] what happened but he didn't want to tell or rat on anyone else involved." (*Id.*) Smith responded: "I'll tell you what I did without a lawyer present." (*Id.*) The detectives re-read Smith his *Miranda v. Arizona*, 384 U.S. 436 (1966) warnings, and Smith said he understood his rights. (*Id.*) The recorded transcript of the interview reads in pertinent part:

| | |
|---|---|
| Detective: | Okay. Like I said, you can say what you want. If you don't want to, say, about this is what other people did—that's up to you. You know what I mean? I'm not gonna— |
| Smith: | But that don't make it look worse on me than I don't say nothing about somebody else? |
| Detective: | I would rather have you cooper- but you know what? It depends on the situation. You know what? Some people could say they could understand. You know what I mean? If, you know, there might be a certain type of individuals that you're very close with not wanting to say what, you know, so— you know what? It depends on the situation. But what my thing is—it's— it— it's up to you. It's up to you. |
| Smith: | You know cuz I really want—I wanna talk to you all man but— |
| Detective: | Well, like I said—you can— |
| Smith: | Know what I'm sayin'? |

2

| | |
|---|---|
| Detective: | You can, listen, you can- you can tell us what you wanna tell us and what you don't wanna tell us, you don't have to right now. You know what I mean? And if you don't want to, that's up to you. If you don't wanna tell us who else, you know, what other peoples' parts were, that's your decision. You know what I mean? Do you wanna tell us what your part in this was, Omar? |
| Smith: | I want to, but I kind a wanna lawyer present, but I don't want it to look like if I wait for my lawyer. |
| Detective: | It's your decision. |
| Smith: | I don't want it to look worse for me if I wait for my lawyer. |
| Detective: | Omar. Omar. This is your decision. We can't help you with that. Okay? I can't tell ya to do one or the other. It's your decision. Like I said, remember in the rights, it said you can answer some questions and you can pick and—it's also you can pick and choose what questions you want. So it's your decision whether you want- not answer any or answer some, or it's your decision. |
| Smith: | Hmm. Fire away with your own questions—I don't— |
| Detective: | Sure you want (inaudible) you wanna—you wanna—tell us what happened? |
| Smith: | Umm, fire away with your questions. |
| Detective: | Does that mean yes? |
| Smith: | Go right ahead. |
| Detective: | What's that? |
| Smith: | Go right ahead. |

(Answer, Exh. 21, Docket # 12-21.) Smith then proceeded to make incriminating statements. (Docket # 12-5 at 4-5.) Smith argued that his confession should be suppressed because he invoked his right to a lawyer at the start of the second interview when he said: "I

kinda wanna lawyer present, but I don't want it to look like if I wait for my lawyer." (*Id.* at 5.) The trial judge denied the suppression motion, finding the statement "ambiguous and equivocal." (*Id.*) The trial judge further found that when the detectives clarified whether Smith wanted to talk, Smith stated: "Yes, go right ahead." (*Id.*)

Smith's trial began on November 1, 2010. When the detective testified, the State played the audio recording of Smith's interview with police and the prosecutor gave each juror a written transcript of the recorded interview to help them follow along. (*Id.* at 12.)

On the morning of November 3, 2010, the State called Smith's co-actor, Alfonzo Treadwell, to testify. (*Id.* at 5.) Treadwell testified that he pled guilty to a charge of homicide for the shooting that occurred on April 17, 2009 and was sentenced to prison. (*Id.*) When asked if he and Smith were involved in the shooting on April 17, 2009, Treadwell responded: "Man, I keep telling you all, man . . . . I keep telling you all, man, people keep trying to make me, you know what I'm saying, do something I don't want to do. This the second time they brought me down here and I told them . . . . If you all get him, you get him on your own." (Formatting altered.) When pressed to answer, "Yes or no?", he answered "No." When asked to tell the jury what happened on April 17, 2009, Treadwell just kept saying "I told you all. I told you all already, man." (*Id.* at 6.)

The trial judge sent the jury out the courtroom and the trial judge told Treadwell that it could find him in contempt, "in effect add time on to your sentence. Now if I bring the jury out here, are you going to answer the questions?" Treadwell replied: "Nope." (*Id.*) The trial judge passed Treadwell as a witness until after lunch. (*Id.*) The trial judge told the

4

prosecutor: "One of the things that you could certainly do is you can ask me to declare him unavailable because of his refusal to testify and then you can have his statement admitted into evidence under 908.045(4), a statement against interest," and suggested the prosecutor "use the noon hour to find out if he's [Treadwell] going to cooperate." Smith's lawyer then said: "Your Honor, just so the Court -- I'm sure the Court is aware of this, but we would strongly object to [declaring Treadwell unavailable]. My client does have a right to face his accusers." (*Id.*)

After lunch, the State recalled Treadwell. Treadwell "sat in the witness stand mute, not saying a word." (*Id.* at 7.) The prosecutor attempted to put Treadwell's prior statements to police into evidence by asking, in pertinent part, the following questions:

- "Did you tell Detective Billy Ball on tape that a few days prior to this homicide of Jordan Alvarez that you were at Omar Smith's house, that he was your friend and the house that Omar Smith was at, at 1629 North 14th Street, was shot up?"

- "Do you recall telling Detective Billy Ball that a few days prior to this homicide that Omar Smith's house was shot up and that Omar had been very upset and his family was also upset over the shooting?"

- "Do you recall telling Detective Billy Ball that on the day of the homicide that you were at Omar Smith's house at 1629 North 14th Street; and that at one point while you were over there, Omar Smith walked up to him and said, quote, come on with the heat, unquote?"

- "Do you recall telling Billy Ball that at this point that you got into a white two-door car that belonged to Omar's friend named Juggy, that you got in the backseat behind the passenger and Omar was in the backseat behind the driver? It further stated that

there was a black male that was dark complected in the front seat of the two-door car and that he was a friend of Juggy."

- "Do you recall telling Detective Billy Ball that while you were driving and riding in that car that you sat in the backseat and loaded eight bullets into your .45 caliber pistol, which you have - - you then cocked so it would be ready to fire when they got out?"

- "Do you recall stating to Billy Ball that Juggy drove them to the area of 23rd and McKinley? When Juggy stopped the car, he overheard Omar telling Juggy to wait for them."

- "Do you recall that upon the car being stopped that you immediately got out and ran towards the house on 24th Street where all the people were out at? Do you recall stating that you saw a guy named Ricky standing out and that you fired two or three shots at Ricky?"

- "Do you recall stating that you fired four or five shots at a black car . . . and that the gun that you were using was a black .45 caliber pistol, which was yours?"

- "Do you recall stating that after you had fired all of your bullets, you began to hear more gunshots and did not know if it was coming from Omar and the other black male or whether people were shooting back at them, so you began to run from the scene?"

- "Do you recall telling Billy Ball that when this incident occurred that you were wearing a pair of blue jeans, white dukies and a black hoody?"

- "Do you recall telling Billy Ball upon looking at a photo of a Harold Conner, this person, Harold Conner, in the photo that you looked at was the person that you know as Juggy and that Juggy was the driver of the two-door white automobile?"

- "Do you recall also during this statement that you identified photographs shown to you of Omar Smith, who is the defendant

in court here today, and you stated that that is Omar the person who asked you to come with him to do the shooting?"

- "Do you recall at that time telling the detectives . . . that Omar wanted to go over to the area of 24th and McKinley to retaliate because Omar Smith believed that the, quote, Deuce Squad, unquote, shot at his mother's house?"

- "Do you recall telling the Police Detectives … that [the third shooter] shot two to three times with the .22 and that his gun jammed and that you shot approximately four to five times and that Omar shot everything and then his gun locked back?"

(*Id.* at 7-9.) Treadwell refused to respond to these or any other questions during the State's direct examination. (*Id.*at 9.) Treadwell did not respond to most of the questions that Smith's lawyer asked on cross-examination. (*Id.*) Smith did not object during Treadwell's afternoon non-responsiveness. (*Id.*)

The following afternoon, Smith's lawyer asked the trial judge for a mistrial because Treadwell's refusal to answer questions denied Smith his right to confrontation. His lawyer told the trial judge that he did not object the day before because: "there were certain things that [he] wanted to get out from Mr. Treadwell. Especially if he was going to be declared unavailable" but "he just stopped talking. He did almost all of this in front of the jury." (*Id.*)

The State opposed the request for a mistrial in favor of striking all of Treadwell's testimony—both the morning testimony where he did answer questions, and the afternoon testimony, where he stayed silent. (*Id.* at 9-10.) Smith's lawyer

asked the trial court to keep Treadwell's morning testimony, but strike all the questions asked in the afternoon. (*Id.* at 10.) The trial judge denied the motion for a mistrial, opting to strike the questions asked in the afternoon. (*Id.* at 10-11.) Both counsel agreed on the following curative jury instruction:

> The Court has ordered struck all testimony of Alfonzo Treadwell from the afternoon of Wednesday, November [3rd]. The jury is ordered to disregard what occurred during the afternoon of November [3rd] regarding the testimony of Treadwell. In particular, all questions and comments by the attorneys and the Court and any responses given by Treadwell because there is no evidence on this record that any of those questions, comments, and responses were based in fact. His testimony from the morning of November [3rd] is not affected by this order and it is in evidence.
>
> Remarks of the attorneys are not evidence. If the remarks suggested certain facts not in evidence, disregard that suggestion.

(*Id.* at 11.) The trial court read a slightly different instruction to the jurors at the end of the case:

> The Court has struck all of the testimony of Alfonzo Treadwell from the afternoon of Wednesday, November 3rd. The jury is ordered to disregard and not consider in any manner whatsoever during your deliberations what occurred during the afternoon of November 3rd regarding the testimony of Treadwell, in particular all questions and comments by the attorneys and the Court and any response given by Treadwell, because there is no evidence on this record that any of those questions, comments and responses were based in fact. His testimony from the morning of November 3rd is not affected by this order, and it is in evidence. Remarks of the attorneys are not evidence. If the remarks suggested certain facts not in evidence, disregard the suggestion.

(*Id.*) The jury found Smith guilty. (*Id.* at 12.) Smith appealed his judgment of conviction, and the court of appeals affirmed his conviction on September 10, 2013. (Docket # 12-5.) The Wisconsin Supreme Court denied review on February 19, 2014. (Answer, Exh. 8, Docket # 12-8.) Smith's federal habeas corpus petition was filed on May 18, 2015. (Docket # 1.)

## STANDARD OF REVIEW

Smith's petition is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under AEDPA, a writ of habeas corpus may be granted if the state court decision on the merits of the petitioner's claim (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

A state court's decision is "contrary to . . . clearly established Federal law as established by the United States Supreme Court" if it is "substantially different from relevant [Supreme Court] precedent." *Washington v. Smith*, 219 F.3d 620, 628 (7th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). The court of appeals for this circuit recognized the narrow application of the "contrary to" clause:

> [U]nder the "contrary to" clause of § 2254(d)(1), [a court] could grant a writ of habeas corpus . . . where the state court applied a rule that contradicts the governing law as expounded in Supreme Court cases or where the state court confronts facts materially indistinguishable from a Supreme Court case and nevertheless arrives at a different result.

9

*Washington*, 219 F.3d at 628. The court further explained that the "unreasonable application of" clause was broader and "allows a federal habeas court to grant habeas relief whenever the state court 'unreasonably applied [a clearly established] principle to the facts of the prisoner's case.'" *Id.* (quoting *Williams*, 529 U.S. at 413).

To be unreasonable, a state court ruling must be more than simply "erroneous" and perhaps more than "clearly erroneous." *Hennon v. Cooper*, 109 F.3d 330, 334 (7th Cir. 1997). Under the "unreasonableness" standard, a state court's decision will stand "if it is one of several equally plausible outcomes." *Hall v. Washington*, 106 F.3d 742, 748-49 (7th Cir. 1997). In *Morgan v. Krenke*, the court explained that:

> Unreasonableness is judged by an objective standard, and under the "unreasonable application" clause, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."

232 F.3d 562, 565-66 (7th Cir. 2000) (quoting *Williams*, 529 U.S. at 411), *cert. denied*, 532 U.S. 951 (2001). Accordingly, before a court may issue a writ of habeas corpus, it must determine that the state court decision was both incorrect and unreasonable. *Washington*, 219 F.3d at 627.

## ANALYSIS

Smith raises three grounds for relief in his habeas petition. In ground one, Smith alleges that his Fifth Amendment right against self-incrimination was violated when his statement to the detectives was admitted at trial. In ground two, Smith alleges that his Sixth Amendment right to confrontation was violated when the trial judge allowed the State to

read in Treadwell's statement in the form of questions. Finally, in ground three, Smith alleges that his trial counsel was ineffective for failing to timely object to a violation of Smith's right to confrontation. I will address each in turn.

1. *Fifth Amendment Claim*

Smith argues that his statement to law enforcement was admitted at trial in violation of his rights under the Fifth Amendment. Smith argues that the detectives violated Smith's rights under *Miranda* by continuing to question him after he unambiguously invoked his right to counsel. (Petitioner's Br. at 17, Docket # 14.) Smith argues that the court of appeals' decision was based on an unreasonable determination of the facts and contrary to clearly established federal law.

Smith argues that the court of appeals' factual determination that his statement did not unambiguously invoke his right to a lawyer was an unreasonable determination of the facts. Smith argues that the court of appeals improperly "cherry picked" the middle of his statement where he said that "I kinda wanna lawyer present," ignoring both the beginning and the end of his statement. (Petitioner's Am. Reply Br. at 3-4, Docket # 20.) Smith states: "When asked by the detective if he would speak to them[,] Smith's actual response was '*I want to, but* I kinda wanna lawyer present, but I don't want it to look like I wait for my lawyer.'" (Petitioner's Br. at 18.) (emphasis added by petitioner). Smith notes that the trial judge explained, though the transcript does not show, that the detective began talking over Smith, cutting him off by stating "It's your decision." (*Id.*) Smith argues that "[d]espite being cut off by the detective[,] Smith finished what he was trying to say telling the

11

detective, 'I don't want it to look worse if I wait for my lawyer.'" (*Id.*) Smith further argues that the court of appeals' finding that the detective clarified whether Smith wanted to continue with the interview or stop was unreasonable as "the detectives never attempted to clarify Smith's intentions." (Petitioner's Am. Reply Br. at 6.)

As an initial matter, Smith challenges the respondent's statement that in federal habeas corpus proceedings, state court fact-finding is presumptively correct and Smith bears the burden of rebutting the presumption of correctness by clear and convincing evidence, citing 28 U.S.C. § 2254(e)(1). Rather, Smith argues that pursuant to § 2254(d)(2), he need not prove that the state court's decision was based on an unreasonable determination of the facts by clear and convincing evidence. (Petitioner's Am. Reply Br. at 5.)

The Seventh Circuit has stated that under § 2254(d)(2), a decision involves an unreasonable determination of the facts if it rests upon factual findings that ignore the clear and convincing weight of the evidence. *Goudy v. Basinger*, 604 F.3d 394, 399 (7th Cir. 2010). In 2010, the United States Supreme Court granted certiorari in *Wood v. Allen*, 558 U.S. 290 (2010) to address the relationship between §§ 2254(d)(2) and (e)(1). Courts of appeals were divided on the question of whether, to satisfy § 2254(d)(2), a petitioner must establish only that the state court factual determination on which the decision was based was "unreasonable," or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence. *Id.* at 299. The *Wood* Court ultimately concluded that it was unnecessary to clarify this question to resolve the case before it. *Id.* at 293.

As in *Wood*, it is unnecessary to resolve this conflict. Even under the less deferential standard set out in § 2254(d)(2), *see id.* at 301 (noting that § 2254(e)(1) set out an "arguably more deferential standard" than § 2254(d)(2)), the court of appeals' factual determinations were not unreasonable. While Smith argues the court of appeals improperly "cherry picked" the middle of his statement, the court of appeals in fact cited to the portions of his statement that he argues the court failed to consider, namely the "I want to, but" language preceding "I kinda wanna lawyer present" and Smith's statement that "I don't want it to look worse for me if I wait for my lawyer." (Docket # 12-5 at 3.) Further, Smith argues that the state court's determination that he "hedged . . . undoubtedly hinges on him having used the word 'but,'" which was unreasonable. (Petitioner's Br. at 18.) Smith argues that his use of the word "but" was not hedging and he "clearly let the detectives know that he wanted to talk, only he wanted a lawyer present without it being held against him as a condition of him waiting for his lawyer." (*Id.*)

However, the words the court of appeals focused on as "hedging" was not the "but," as Smith argues. The "hedging" language the court focused on was "I kinda wanna lawyer present." There is a difference between stating that one wants a lawyer present and one "kind of" wants a lawyer present. It was not unreasonable for the court of appeals to determine that Smith's statement that he "kind of wanted" a lawyer present was ambiguous. Further, the court of appeals' finding that the detectives clarified Smith's intentions was not unreasonable. As cited above, the detective asked three follow-up questions to confirm Smith's intent to speak with them. (Docket # 12-21 at 4) ("Sure you want . . . tell us what

happened? Does that mean yes? What's that?"). For these reasons, Smith has not shown that the court of appeals' decision was based on an unreasonable determination of the facts.

Smith also argues that the court of appeals' decision was contrary to clearly established federal law pursuant to § 2254(d)(1). (Petitioner's Br. at 21.) The Supreme Court has stated that invocation of the *Miranda* right to counsel is an objective inquiry that "'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Davis v. United States*, 512 U.S. 452, 459 (1994) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)). However, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.* (emphasis in original).

In *Davis*, the Supreme Court found that the statement "Maybe I should talk to a lawyer" was ambiguous. *Id.* at 462. In finding Smith's statement "I kinda wanna lawyer present, but I don't want it to look like if I wait for my lawyer" ambiguous, the court of appeals cited and relied on *Davis*' finding in its decision. (Docket # 12-5 at 13.) Smith does not argue there is any significant difference between "maybe" and "kinda," both words invoking uncertainty.

Smith further argues that the court of appeals' decision runs contrary to *Smith v. Illinois*, 469 U.S. 91 (1984). In *Smith*, after being told he had a right to consult with a lawyer and have a lawyer present during questioning, the suspect responded with "Uh, yeah. I'd

like to do that." 469 U.S. at 93. Rather than ceasing questioning, however, the interrogating officers continued to read the suspect his rights and then pressed him again to answer their questions. *Id.* The suspect then agreed to talk to the officers. *Id.* It was undisputed that the suspect's initial request for counsel—"Uh, yeah. I'd like to do that"—was an unambiguous request for an attorney. The courts were only able to construe the suspect's request for counsel as "ambiguous" by looking to his subsequent responses to continued police questioning. *Id.* at 97. The Supreme Court found this improper, holding that an accused's post request responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself. *Id.* at 100.

*Smith* is inapposite. In *Smith*, the suspect unambiguously requested an attorney and rather than stopping the questioning, the officers continued to read him his rights and press him to answer questions. It was only then that the suspect agreed to talk to officers. Contrary to *Smith*, in this case, when Smith initially requested counsel, the interrogation stopped and the officers left the room. When an officer returned to give Smith a cigarette that Smith had asked for, Smith reinitiated the interview and made the ambiguous request of "I kinda wanna lawyer present." *See Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981) ("We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.").

Thus, unlike in *Smith*, in this case, Smith's agreement to speak after he reinitiated the interview is not being used to cast doubt on his initial request for an attorney. Rather, because the officers undisputedly stopped the initial interview when Smith requested counsel, the court of appeals focused on the period after Smith reinitiated the interview. For these reasons, Smith has not shown the court of appeals' decision was contrary to, or involved an unreasonable application of, clearly established Federal law. Thus, he is not entitled to habeas relief as to ground one of his petition.

2.      *Sixth Amendment Claim*

Smith also argues that his Sixth Amendment right to confront witnesses against him was violated when the prosecutor put Treadwell's statement into evidence under the guise of posing questions that Treadwell refused to answer. (Petitioner's Br. at 22.)

As an initial matter, Smith argues that the state court failed to reach the merits of his Sixth Amendment claim and thus AEDPA's deferential constrains do not apply and his claim should be reviewed *de novo*. (Petitioner's Br. at 23.) AEDPA's deferential standard of review applies only to claims that were actually "adjudicated on the merits in State court proceedings." *Harris v. Thompson*, 698 F.3d 609, 623 (7th Cir. 2012) (quoting 28 U.S.C. § 2254(d)). Where the state courts did not reach a federal constitutional issue, the claim is reviewed *de novo*. *Id.*

The court of appeals noted that Smith argued that the questions the prosecutor asked Treadwell the afternoon of November 3 prejudiced him and violated his right to

confrontation. Smith also argued that his lawyer acted ineffectively by not objecting until the day after Treadwell testified. (Docket # 12-5 at 14.) Smith argued *Bruton v. United States*, 391 U.S. 123 (1968) and *Cruz v. New York*, 481 U.S. 186 (1987) controlled. (Answer, Exh. 2, Docket # 12-2 at 31-32.) Citing *Kimmelman v. Morrison*, 477 U.S. 365 (1986), the court found that when a defendant claims his constitutional rights were violated but his trial lawyer did not timely preserve an objection to the alleged violation, the claim is reviewed in the context of an ineffective assistance of counsel claim. (*Id.*) However, in so doing, the court of appeals addressed the merits of Smith's *Bruton* and *Cruz* argument. For these reasons, I find that Smith's claim was adjudicated on the merits and will not review the court of appeals' decision *de novo*.

Out-of-court statements by witnesses that are testimonial are barred, under the Confrontation Clause, unless witnesses are unavailable and the defendant had a prior opportunity to cross-examine the witnesses, regardless of whether such statements are deemed reliable by the court. *Crawford v. Washington*, 541 U.S. 36, 54-56 (2004). Smith argues that the prosecutor reading Treadwell's statements in the form of questions, and Treadwell refusing to testify, deprived him of his right to confront the witness. (Petitioner's Br. at 23.) As the respondent notes, Smith's right to confrontation would have been violated had the jury been allowed to find, based on the prosecutor's unanswered questions, that Treadwell made the testimonial statements to the police that were the subject of the prosecutor's questions. (Resp. Br. at 20-21.) But Treadwell's statements were stricken and

therefore were not admitted as evidence. For this reason, there was nothing to cross-examine as there was no admitted testimony.

Smith challenges the trial court's decision to strike the testimony and issue a curative instruction rather than grant a mistrial. Citing *Bruton* and *Cruz*, Smith argues that the prejudice he suffered could not be remedied or cured by a jury instruction. (Petitioner's Br. at 24.) The court of appeals held that neither *Bruton* nor *Cruz* were applicable because both cases involved trials where co-defendants were tried together and in both cases the testimony was admitted, subject to a limiting instruction. (Docket # 12-5 at 16.) In Smith's case, Treadwell had pled guilty and had already been convicted; thus, it was not a joint trial. Further, unlike in *Bruton* and *Cruz* where the testimony was admitted subject to a limiting instruction, the court of appeals found that the trial court struck all of Treadwell's afternoon non-responsive testimony and ordered the jury to "not consider [it] in any manner whatsoever during its deliberations." (*Id.*)

Beyond asserting that "it makes no sense" that Treadwell's "powerfully incriminating extrajudicial statements" were "somehow less devastating to Smith because he was not tried jointly with Treadwell," (Petitioner's Am. Reply Br. at 9-10), Smith points to no law extending *Bruton* and *Cruz*'s reasoning to cases where co-defendants were not jointly tried. Furthermore, Treadwell's testimony was stricken. Thus, Smith has not shown that the court of appeals' decision was contrary to, or involved an unreasonable application of, *Bruton* and *Cruz*. Thus, Smith is not entitled to relief as to ground two of his petition.

*3.      Ineffective Assistance of Trial Counsel*

Smith argues his trial counsel was ineffective for failing to lodge a contemporaneous objection as the state introduced Treadwell's statements in the form of questions. (Petitioner's Br. at 28.)

The clearly established Supreme Court precedent for ineffective assistance of counsel claims is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To establish ineffective assistance of counsel, Smith must show both "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Id.* at 687. To satisfy *Strickland*'s performance prong, the defendant must identify "acts or omissions of counsel that could not be the result of professional judgment." *United States ex rel. Thomas v. O'Leary*, 856 F.2d 1011, 1015 (7th Cir. 1988) (citing *Strickland*, 466 U.S. at 690). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (quoting *Strickland*, 466 U.S. at 689). A reviewing court must seek to "evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. We "must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance," *id.*, and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," *id.* at 690.

To establish prejudice, it is "not enough for the defendant to show that his counsel's errors had some conceivable effect on the outcome of the [trial]." *Hough v. Anderson*, 272

F.3d 878, 891 (7th Cir. 2001). A petitioner must show "that there is a reasonable probability that, but for counsel's errors, the result of the [trial] would have been different." *Strickland*, 466 U.S. at 694. This does not mean that the defendant must show that "counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693. Rather, a "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Making this probability determination requires consideration of the totality of the evidence before the jury. *Id.* at 695. A "verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696.

A court deciding an ineffective assistance claim need not approach the inquiry "in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result." *Id.*

In this case, the court of appeals focused on the prejudice analysis and did not address whether counsel's performance was deficient. Smith argues, however, that the court of appeals applied the wrong legal standard for determining prejudice because it quoted *State*

20

*v. Smith*, 207 Wis. 2d 258, 558 N.W.2d 379 (1997), which cited *Lockhart v. Fretwell*, 506 U.S. 364 (1993). Smith argues the Supreme Court rejected the "reliability" analysis applied by the state court in his case. (Petitioner's Br. at 31.) The respondent argues that the court of appeals utilized "a typical *Strickland*-style analysis" in assessing his ineffective assistance of counsel claim and further argues that the Supreme Court has said that *Lockhart* remains good law. (Resp. Br. at 29.)

As the Seventh Circuit explained in *Washington v. Smith*, 219 F.3d 620, 632 (7th Cir. 2000), the Supreme Court in *Williams v. Taylor*, 529 U.S. 362 (2000) clarified the tension between *Strickland* and *Lockhart*. The *Williams* Court found that *Strickland* governs the prejudice inquiry in most habeas cases and that the decision in *Lockhart* does "'not justify a departure from a straight-forward application of *Strickland* when the ineffectiveness of counsel does deprive the defendant of a substantive or procedural right to which the law entitles him.'" *Id.* (quoting *Williams*, 529 U.S. at 393). Rather,

> *Lockhart's* heightened prejudice analysis only applies in cases where the defendant challenges his conviction based upon unusual circumstances that, as a matter of law, do not typically inform the court's inquiry. For example, such unusual circumstances could occur when a state court relies on overruled law, *see Lockhart*, 506 U.S. at 384, or the defendant's lawyer refuses to let him commit perjury, *see Nix v. Whiteside*, 475 U.S. 157, 171 (1986). Absent such unusual circumstances, *Strickland's* prejudice analysis is the proper framework for assessing a Sixth Amendment claim.

*Goodman v. Bertrand*, 467 F.3d 1022, 1028 (7th Cir. 2006). In *Washington*, the Wisconsin Court of Appeals applied *Lockhart's* prejudice standard instead of *Strickland's*, even though the defendant was not relying on the usual considerations articulated in *Lockhart* or *Nix* that would trigger the heightened prejudice standard of *Lockhart*. 219 F.3d at 632. As such, the

Seventh Circuit concluded that "[t]he Wisconsin Court of Appeals apparently did not fully grasp the proper interaction between *Strickland* and *Lockhart* in determining that [the petitioner] did not show prejudice, and in so doing, its decision was both 'contrary to' and 'involved an unreasonable application of' the proper prejudice analysis prescribed by the Supreme Court." *Id.*

In Smith's case, the Wisconsin Court of Appeals cited to both *Strickland* and *Smith*, which relies on *Lockhart's* prejudice standard of determining whether counsel's deficient performance "renders the result of the trial unreliable or the proceeding fundamentally unfair." (Docket # 12-5 at 14.) Although the court of appeals cited both prejudice standards, unlike in *Washington* where the court of appeals was clearly applying *Lockhart*, it is unclear which standard it applied in its analysis of Smith's claim. The court of appeals merely stated "[t]here was no prejudice here" and "Smith was not prejudiced." (*Id.* at 14-15.) As in *Washington*, Smith is not relying on the usual considerations of *Lockhart* or *Nix* that would trigger *Lockhart's* prejudice standard. Thus, prejudice in Smith's case should have been determined under the *Strickland* standard, i.e., did Smith show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different? *See Washington*, 219 F.3d at 633 (citing *Strickland*, 466 U.S. at 694).

Although it is not entirely clear, the court of appeals arguably engaged in both a *Strickland* prejudice analysis and a *Lockhart* analysis. The first paragraph of the court of appeals' prejudice analysis is undisputedly a *Strickland* analysis. The court of appeals cited to other evidence, besides Treadwell's statements, pointing to Smith's guilt, including: Smith's

confession, witness Howard Conner, who testified that he drove Smith, Treadwell, and a third man to the area of 21st and Vliet on April 17, 2009 around 8:30 p.m.; testimony of the surviving victims that they saw three men with black hoodies shooting at them from across the street; and the fact the bullet that killed the victim came from a nine millimeter gun, which Smith admitted was the same type of gun he shot that night. (Docket # 12-5 at 15, ¶ 21.) Generally, it is more difficult for a petitioner to show prejudice from counsel's error when there is substantial, independent evidence to support the jury's verdict. *See Stuckey v. Hulick*, 258 Fed. Appx. 891, 895 (7th Cir. 2007).

However, in the second paragraph of the prejudice analysis, the court of appeals reasoned that Smith's lawyer asked to keep in Treadwell's morning testimony, even though he did not cross examine Treadwell and both the State and Smith agreed to the trial court's proposed curative instruction. (Docket # 12-5 at 15, ¶ 22.) The court of appeals also noted that the trial court read the jury the curative instruction twice and explicitly ordered the jury to ignore everything asked of Treadwell and his non-responsiveness, stating that none of it was evidence and should not be considered. (*Id.*) This analysis reads more like a determination of whether the proceeding was fundamentally unfair.

Assuming the court of appeals incorrectly analyzed prejudice under *Lockhart*, Smith has shown that the court of appeals' decision is contrary to federal law. *McNary v. Lemke*, 708 F.3d 905, 913 (7th Cir. 2013) ("The state court's decision is 'contrary to' federal law if it employs the wrong legal standard established by the Supreme Court."). The analysis, however, does not end there. "'Where the state court's decision is 'contrary to' federal law,

that decision is not entitled to the usual AEDPA deference and is therefore reviewed *de novo* with the reviewing court applying the correct legal standard.'" *Ford v. Wilson*, 747 F.3d 944, 953 (7th Cir. 2014) (quoting *Mosley v. Atchison*, 689 F.3d 838, 844 (7th Cir. 2012)). Thus, I must apply the correct legal standard (i.e., *Strickland*) to Smith's claim, without deference to the state court's decision, to determine whether Smith was prejudiced by his counsel's failure to lodge a contemporaneous objection as the state introduced Treadwell's statements in the form of questions.

Applying *Strickland*, I do not find that Smith was prejudiced by his attorney's errors. Again, it is more difficult to find prejudice when there is substantial, independent evidence supporting the jury's verdict. In this case, the jury had strong evidence of guilt in the form of Smith's confession. At Smith's trial, evidence of his recorded statement to law enforcement was admitted, as well as a transcript of the recorded statement, marked as Exhibit 127. (Transcript of Jury Trial on Nov. 3, 2010, Docket # 12-16 at 137-40; Transcript of Jury Trial on Nov. 4, 2010, Docket # 12-17 at 16-17.) During this statement, Smith stated that he and two other men were dropped off at 24th Street and Vliet (Docket # 12-21 at 24-25) and began walking towards 26th Street and McKinley, (*id.* at 8). They saw a group of men and women standing in front of a house across the street (*id.* at 25) and Smith "just started shootin'" and he "shot till there wasn't no more bullets" (*id.* at 8). He admitted to using a nine-millimeter gun. (*Id.*) Smith stated that he did not shoot at anyone specifically, but shot above the crowd. (*Id.* at 9.) Smith stated that he was wearing a black hoodie and shorts that night and stated that after the shooting he "took off." (*Id.* at 11, 24.)

Smith's confession is corroborated by other evidence in the record. Howard Conner, a family friend of Smith's, (Transcript of Jury Trial Nov. 3, 2010, Docket # 12-16 at 91) testified that on April 17, 2009, he dropped Smith, Treadwell, and another man off at 21st Street and Vliet a little before 8:30 p.m. (*id.* at 100, 106). Thus, this corroborates that Smith was at the scene of the crime.

Also, two witnesses (including a shooting victim who survived) testified to seeing three men across the street wearing dark clothing and hoods approach the group of people standing outside of 2465 West McKinley in Milwaukee on April 17, 2009. (Transcript of Jury Trial on Nov. 2, 2010, Docket # 12-13 at 44-49, 54, 56; Transcript of Jury Trial Nov. 3, 2010, Docket # 12-15 at 5, 14, 19, 21.) Smith admitted he was wearing a black hoodie that night and Conner's testimony confirmed Smith was with two other men.

Further, Smith stated he used a nine-millimeter gun during the shooting. During Smith's trial, evidence was admitted that three different caliber casing were found at the scene, indicating that three different guns were used in the crime. (Transcript of Jury Trial Nov. 2, 2010, Docket # 12-14 at 83, 86.) However, the victim was killed by bullets from a nine-millimeter gun (Transcript of Jury Trial Nov. 3, 2010, Docket # 12-16 at 34) and thirteen nine-millimeter casings were found at the scene (Docket # 12-14 at 78). All thirteen casings came from the same gun. (*Id.*)

Given the substantial evidence of Smith's guilt separate and apart from Treadwell's statements, I do not find that Smith was prejudiced by his attorney's errors. For this reason, Smith is not entitled to habeas relief on this ground. Because I find Smith is not entitled to

habeas relief on any of the three grounds raised, his petition for writ of habeas corpus is denied and the case is dismissed.

## CERTIFICATE OF APPEALABILITY

According to Rule 11(a) of the Rules Governing § 2254 Cases, the court must issue or deny a certificate of appealability "when it enters a final order adverse to the applicant." A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make a substantial showing of the denial of a constitutional right, the petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893, and n.4).

I do not find that jurists of reason could debate that the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further. Even though the Wisconsin Court of Appeals arguably applied the wrong legal standard to Smith's ineffective assistance of counsel claim, when applying the correct standard, I get the same result. For these reasons, I will deny Smith a certificate of appealability. Smith retains the right to seek a certificate of appealability from the Court of Appeals pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the petitioner's petition for a writ of habeas corpus (Docket # 1) be and hereby is **DENIED**.

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**.

**IT IS ALSO ORDERED** that a certificate of appealability shall not issue.

**FINALLY, IT IS ORDERED** that the Clerk of Court enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 11th day of September, 2018.

BY THE COURT:

_s/Nancy Joseph_____
NANCY JOSEPH
United States Magistrate Judge